===================================================================

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

===================================================================

| | | |
|---|---|---|
| **VIJAY TANDON** | } | **CASE NO.**_____ |
| Plaintiff | } | |
| -against- | } | **COMPLAINT** |
| **COINBASE, INC.,** | } | JURY TRIAL DEMANDED |
| Defendant | } | |

===================================================================

## I. INTRODUCTION

**1. Nature of the Action:** This action arises from the unauthorized conversion and removal of approximately 1,000 ETH (the "Property") from a custodial digital asset account maintained by Defendant Coinbase, Inc. on November 11, 2020. The theft was not the result of an external consumer security breach or a remote third-party hack. Rather, the assets were exfiltrated directly through Coinbase's internal custodial infrastructure following an unauthorized, unauthenticated unauthorized administrative modification of the account's daily withdrawal limits.

**2. Plaintiff's Independent Non-Signatory Status:** Plaintiff Vijay Tandon holds a vested, indivisible, and independent ownership interest in the Property as a tenant by the entirety, derived from joint marital capital governed by entirety property laws. Plaintiff is a strict non-signatory to the Coinbase User Agreement. Plaintiff never executed, assented to, or ratified any terms of service with Defendant, never agreed to arbitrate disputes, and never authorized any spouse, agent, or third party to subject his personal property rights to Defendant's contractual waivers or liability limitations.

**3. Unauthorized Security Overrides:** According to Defendant's own business records, the account's daily withdrawal limit was artificially **inflated from $150,000 to $400,000** less than

1

seven hours before the unauthorized transfers occurred. Defendant has failed to produce any verification logs, electronic records, or security metadata confirming that a legitimate user request was ever initiated, or that standard multi-factor security verification challenges were completed to authorize this high-risk modification.

**4. The Internal "Insider" Footprint:** Internal transaction metadata demonstrates that the transfers were executed entirely within Defendant's core network. Security logs reveal that in the days immediately preceding the theft, the account backend was accessed from a private network signature **(10.120.x.x)** belonging exclusively to Defendant's internal backend infrastructure and corporate intranet. Furthermore, the electronic records for the November 11 transfers contain **"Null" entries for both the transaction source and the originating IP address**—a configuration that is technically **irreconcilable with any external consumer session** or remote third-party device over the public internet.

**5. Affirmative Deception and Suppression:** Following the loss of the Property, Defendant engaged in a continuous course of fraudulent concealment to protect its internal infrastructure from scrutiny. Defendant provided the property owners with flatly contradictory, evasive explanations, including producing a blank, undated withdrawal limit **"Request Form"** stripped of all identifying user data, and fabricating conflicting timelines regarding the utilization of unauthorized security keys. Defendant actively suppressed its internal backend audit trails to prevent Plaintiff from discovering that the exfiltration was structurally an internal custodial breach.

**6. Pristine Merits of the Claim:** To date, no court, jury, or arbitral body has ever heard evidence, conducted discovery, or adjudicated the true internal factual merits of the November 11, 2020 transfers. Plaintiff brings this independent action to secure the first-ever determination on the merits of his independent common-law property claims, which have never been waived, litigated, or resolved by any tribunal.

**7. Common-Law and Equitable Relief Sought:** Plaintiff asserts independent claims for

2

Fraudulent Concealment, Conversion, Breach of Bailment, and Unjust Enrichment. Plaintiff seeks full restitution representing the highest intermediate market value of the converted 1,000 ETH, unjustly retained by Defendant, and the formal imposition of a Constructive Trust over the Property and its traceable proceeds.

**8. Request for Trial Preference:** Plaintiff is 81 years of age and respectfully requests an expedited trial schedule and special trial preference in the interests of justice, pursuant to **N.Y. C.P.L.R. § 3403(a)(4)** and this Court's inherent power to manage its judicial docket.

## II. JURISDICTION AND VENUE

**9. Subject-Matter Jurisdiction:** This Court has subject-matter jurisdiction over this action pursuant to **28 U.S.C. § 1332(a)(1)**. Complete diversity of citizenship exists because Plaintiff Vijay Tandon is a citizen of the State of Florida, and Defendant Coinbase, Inc. is a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of California. The amount in controversy significantly exceeds $75,000, exclusive of interest and costs. The digital property at issue consists of **approximately 1,000 ETH,** which had an estimated market value of **approximately $500,000 at the time of the initial loss in November 2020,** and maintains a spot market value of approximately **$2,200,000** at the time of this filing. Because the operative measure of damages under New York law represents the highest intermediate market value of the assets during the period of concealment, the total amount in controversy at trial exceeds **$3,000,000**, easily satisfying the statutory threshold.

**10. Personal Jurisdiction:** Defendant Coinbase, Inc. is subject to personal jurisdiction in this District pursuant to **N.Y. C.P.L.R. §§ 301 and 302(a)(1)** because it conducts substantial, continuous, and systematic business within the State of New York and maintains a permanent corporate office and principal East Coast operational hub at **1 Madison Avenue, New York, New York 10010**. Since 2017, Defendant has been licensed by **the New York State Department of Financial Services ("NYDFS")** to conduct virtual currency business activity under the **New York**

**BitLicense** framework, an operational infrastructure it continues to maintain notwithstanding the April 2026 conditional approval of a national trust bank charter for **Coinbase National Trust Company.** The operative facts of this action—specifically the failure of mandatory internal security controls, the unauthorized backend modification of account thresholds, and the subsequent fraudulent concealment of internal system logs—arise directly out of operations managed, supervised, and overseen through Defendant's regulated New York infrastructure. By operating as a licensed money transmitter and custodian in New York, Defendant has purposefully availed itself of the protections and benefits of this forum.

11. **Venue:** Venue is proper in this District pursuant to **28 U.S.C. §§ 1391(b)(1) and (b)(2)**. Venue is proper under **§ 1391(b)(1)** because Defendant resides in this District for venue purposes as it is subject to personal jurisdiction herein. Venue is also proper under § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District, including Defendant's custodial operations, compliance oversight, and corporate decisions executed through its New York offices. Specifically, Defendant's digital-asset custody operations and regulatory compliance frameworks are directed toward and executed within New York, and the categorical refusal to return Plaintiff's property—a necessary element of the conversion and bailment claims—was a corporate decision processed, finalized, and executed by Defendant's compliance and legal teams operating directly out of its New York offices.

## III. PARTIES

12. **Plaintiff Tandon** is a natural person and a citizen of the State of Florida. At all relevant times, Plaintiff held a vested legal, beneficial, and indivisible ownership interest in the approximately 1,000 ETH at issue (the "Property"). The Property was acquired using capital entirely sourced from a joint marital bank account maintained by Plaintiff and his spouse as tenants by the entirety. Under applicable law, property held as tenants by the entirety is owned by the marital unit as a single entity, meaning each spouse is seized of the whole and cannot unilaterally alienate, encumber, or

subject the asset to third-party contractual waivers. Plaintiff's proprietary interest in the Property exists completely independent of any third-party account-holder agreement. Plaintiff never viewed, executed, or assented to Defendant's terms of service, never authorized or ratified the unilateral waiver of his property rights by any third party, and never consented to the transfer, disposition, or loss of the Property.

13. **Defendant Coinbase, Inc.** is a Delaware corporation with its principal place of business located at **430 California Street, San Francisco, California 94104**. Defendant operates a global digital asset platform and acts as a professional bailee, regulated money transmitter, and licensed digital asset custodian for reward. At all times relevant to this action, Defendant managed, operated, and controlled the technical, administrative, and custodial infrastructure through which Plaintiff's Property was held, modified, and ultimately exfiltrated via Defendant's internal network.

## IV. STATUTE OF LIMITATIONS AND TOLLING

14. **Commencement Within Six Years:** The unauthorized internal infrastructure transfers occurred on November 11, 2020. This action, asserting claims for Fraudulent Concealment and Unjust Enrichment, was commenced within the absolute six-year statutory window of the underlying injury and is fully timely as a matter of law pursuant to **N.Y. C.P.L.R. § 213.**

15. **Fraud and Discovery Window (CPLR § 213(8)):** Pursuant to **N.Y. C.P.L.R. § 213(8),** claims sounding in fraud or fraudulent concealment are timely if filed within six years of accrual, or two years from the date the fraud was, or reasonably should have been, discovered by the plaintiff. Because this action was commenced within the absolute six-year window of the November 2020 events, Plaintiff's fraud-based claims are timely irrespective of the discovery rule.

16. **Accrual Rules for Bailment and Conversion:** Because Defendant's initial possession of the Property was in its capacity as a lawful custodian and professional bailee, a cause of action for conversion or breach of bailment legally accrues when a formal demand for the return of the property is flatly refused. Formal administrative disputes demanding the immediate return of the

5

entirety of the stolen assets were submitted to Defendant on **January 2, 2021, and January 27, 2021.** Because the Property is owned by the marital unit as an indivisible whole under tenancy by the entirety principles, these demands were legally exerted on behalf of the entire estate. Defendant definitively closed both disputes without resolution or explanation in **February 2021**, constituting a flat refusal and establishing the operative accrual trigger. To the extent that the three-year limitations period under **C.P.L.R. § 214** might otherwise expire prior to this filing, it is independently preserved, extended, and tolled by Defendant's affirmative fraudulent concealment and the equitable estoppel doctrines set forth below.

17. **Equitable Estoppel and Fraudulent Concealment Tolling:** To the extent any claim is argued to have accrued immediately upon the November 11, 2020 transfer, Defendant is equitably estopped from asserting a statute-of-limitations defense. Throughout the post-theft period, Defendant engaged in affirmative acts of deception and systemic concealment by providing contradictory explanations concerning the alleged API key and authorization mechanisms. Defendant utilized its exclusive control over internal infrastructure logs to intentionally suppress and hide the internal **10.120.x.x** originating **network signatures and "Null" data fields**, electing instead to produce a blank, un-timestamped withdrawal limit **"Request form."**

18. **Consequence of Active Suppression:** These deceptive omissions and spoliations of consumer-facing records were calculated to prevent Plaintiff from discovering that the exfiltration originated within Coinbase's own backend infrastructure rather than via an external customer breach. Plaintiff reasonably relied on Defendant's deceptive investigative half-truths and structural stone-walling to his detriment, actively delaying his discovery of the true, internal network origin of the fraud. Consequently, under well-established New York and federal common-law fraudulent concealment doctrines, Defendant cannot profit from its own deceptive concealment, and the limitations period for all counts is equitably tolled.

**V. STANDING**

**19. Injury in Fact and Particularized Harm:** Plaintiff  Tandon has suffered a concrete, particularized, actual, and ongoing economic injury through the unauthorized exfiltration and continued deprivation of approximately 1,000 ETH. The wrongful conversion of these digital assets constitutes a direct, personal, and proprietary deprivation of property in which Plaintiff holds an independent, vested legal ownership interest, distinct from any contractual claims belonging to third parties.

**20. Independent Property Interest:** Plaintiff's ownership interest in the digital assets exists completely independent of any contractual relationship with Defendant. The assets were acquired using capital held by Plaintiff and his spouse as tenants by the entirety, sourced directly from a joint marital bank account. Under applicable law, property held as tenants by the entirety is owned by the marital unit as a single entity; each spouse is seized of the whole and cannot unilaterally alienate, encumber, or subordinate the asset to third-party contractual terms. Plaintiff never assigned, transferred, or delegated his proprietary rights, nor did he ever authorize or ratify any third party to subject his interest to Defendant's contractual waivers, arbitration clauses, or liability limitations.

**21. Traceability:** Plaintiff's injury is directly and fairly traceable to Defendant's conduct. Defendant, acting as a professional bailee and regulated custodian, maintained exclusive operational control over the internal infrastructure through which the transfers occurred. The loss resulted directly from Defendant's failure to maintain the secure internal administrative and system controls mandated by its New York BitLicense and common-law custodial obligations.

**22. Redressability:** Plaintiff's injury is fully redressable by this Court through an award of compensatory damages, restitution, and the imposition of an equitable constructive trust over the misappropriated assets, their equivalent value, or their traceable proceeds.

**23. Constitutional and Common-Law Standing:** Because Plaintiff's injury arises directly from

Defendant's custodial misconduct and the deprivation of his independent property rights, the harm is concrete, particularized, and judicially redressable. Plaintiff fully establishes both constitutional standing under Article III of the United States Constitution and standing under New York common-law principles of property, equity, and bailment.

## VI. FACTUAL ALLEGATIONS

### A. Account Background

24. In or about December 2017, Plaintiff's spouse opened a cryptocurrency account with Defendant Coinbase, Inc.

25. Defendant operated this account strictly as a custodial platform, maintaining exclusive possession, configuration, and control over the underlying private keys and digital assets. The account holder did not manage individual private keys but relied entirely on Defendant's internal ledger, server infrastructure, and security architecture. In this capacity, Defendant acted as a professional bailee for reward and a regulated digital asset custodian.

26. At all relevant times, Defendant exclusively controlled the backend infrastructure, including the withdrawal authorization protocols, security monitoring systems, and the automated generation of system authentication logs.

27. As of November 10, 2020, the subject account held assets with a market value of approximately $500,000, representing capital in which Plaintiff held a vested, indivisible ownership interest as a tenant by the entirety. Because these assets were reflected solely on Defendant's internal database ledger, Plaintiff's property interest was entirely dependent on Defendant's lawful maintenance of its custodial and administrative security controls.

### B. The November 11, 2020 Unauthorized Liquidation and Transfers

28. On November 11, 2020, without any authorization or initiation from the account holder, the digital assets and fiat holdings were converted into **approximately 1,000 ETH.**

8

**29.** Immediately following this unauthorized conversion, Defendant's internal database ledger **executed forty-one (41) rapid,** outbound ETH transfers to external, third-party digital wallet addresses.

**30.** These 41 transfers were executed in automated, rapid succession over a compressed window during the **middle of the night on November 11, 2020**—a transaction pattern highly indicative of automated system exploitation or internal administrative override, rather than human-initiated end-user trading activity.

**31. The "Limit" Contradiction:** Defendant's own automated infrastructure concurrently generated system notifications stating **that twenty-seven (27)** of these outbound transfers had **failed** because they exceeded the account's strictly established daily withdrawal limits.

**32.** Even though Coinbase's automated security system correctly flagged these transfers as unauthorized and generated failure alerts, Defendant's platform overrode its own internal safety protocols and allowed the stolen assets to be permanently pushed out of the account.

**33. Total Security Infrastructure Bypass:** The exfiltration of Plaintiff's property occurred without standard, mandatory security triggers. Specifically, no "**Withdrawal Started" email** confirmations, no **multi-factor authentication (2FA)** tokens, and no new-device authorization requests were ever transmitted to, or fulfilled by, the account holder.

**34. Zero Credential Compromise or Ownership Lockout:** Throughout the entire duration of the 41 rapid outbound transfers and immediately thereafter, the account holder's login credentials, password, and associated email access remained entirely unaltered and fully functional. The unauthorized actors made no attempt to modify the account password, change the linked communication channels, or lock the user out of the platform.

**35. Absolute Confirmation of Backend Execution:** The complete absence of any account takeover or password alteration, juxtaposed against the system-generated limit-failure notifications, demonstrates that the loss was not the result of an external credential compromise. **External**

**hackers typically alter passwords to prevent user intervention during a theft.** By overriding its own security architecture from within and transferring the assets while leaving the frontend user profile untouched, Defendant exercised unauthorized dominion and control over assets in which Plaintiff held a vested, indivisible property interest.

**C. Post-Incident Concealment and Refusal to Provide Accounting**

36. **Affirmative Spoliation and Deletion of Transaction Ledgers:** Upon Defendant's restoration of account access following a ten-day platform lockdown, it was discovered that Defendant had intentionally altered the consumer-facing account records. Specifically, thirty-eight (38) out of the forty-one (41) unauthorized outbound transactions had been entirely deleted from the visible account Portfolio, and the entire historical transaction **record for the November 11, 2020** window **had been completely erased** from the platform's **"Activity Page."**

37. Following the theft, demands were formally issued to Defendant for:

**(a)** a formal accounting explaining why the system flagged the transfers as "failed" when they were actually executed;

**(b)** an explanation for why the system failed to transmit mandatory security alerts to the linked email address;

**(c)** the identity of the internal or external actor who authorized the modification of the account's daily withdrawal limit; and

**(d)** the complete computer login history, session tokens, and IP addresses linked to the theft.

38. Defendant refused to provide these records, issuing a standardized response stating: "We cannot share this information with you."

39. **Intentional Obstruction:** As a New York BitLicense holder, Defendant is legally required under **23 NYCRR §§ 200.12 and 200.14** to maintain and provide accurate, unalterable transaction records. Defendant's intentional deletion of the transaction history and systematic withholding of backend logs constitutes fraudulent concealment and active spoliation of evidence. This data

10

manipulation was intentionally designed to hide the internal nature of the breach, deceive the property owners, and prevent them from discovering the facts necessary to seek a timely judicial remedy.

**D. Manipulated Modification of Withdrawal Limits and Delayed Notification**

**40.** Prior to November 10, 2020, the subject account was restricted by a daily withdrawal limit of approximately **$150,000,** which served as a critical internal security safeguard.

**41.** Several months prior to the theft, the account holder submitted a documented request to the Defendant to increase the daily **withdrawal limit to $200,000**. Defendant denied that request. Yet, **on November 10–11, 2020**—immediately preceding the 41 unauthorized transfers — Defendant increased the withdrawal limit **to $400,000,** double the previously denied amount, without any user request, authorization, or completion of the platform's ordinary security verification challenges. This unexplained reversal, combined with the precise timing of the increase on the eve of the theft, supports a powerful inference that the limit modification was not user-initiated and instead resulted from an internal administrative action within Defendant's custodial system.

**42. Exclusive Control of Audit Trails:** Defendant maintains exclusive possession of the internal application logs and system metadata that record this limit modification. To date, Defendant has refused to produce any authenticated system logs demonstrating that this high-risk override was initiated by a legitimate, authenticated user session.

**43. On or about November 20, 2020,** in response to direct inquiries regarding the unauthorized limit increase, Coinbase represented in writing that it had received a request to increase the daily withdrawal limit originating from the household's IP address.

**44.** To support this factual assertion, Coinbase subsequently produced what it characterized as the official "request form" for the November 10, 2020 limit increase.

**45.** Upon inspection, the document produced by Coinbase **is entirely blank. It contains no completed data fields, no name, no account identifier, and no timestamped request logs.**

11

**46.** The production of an entirely blank form to justify a critical security override constitutes an affirmative material misrepresentation intended to deceive the property owners and conceal internal infrastructure manipulation.

**47.** Despite repeated demands for the actual system logs that would show the true network source of the alleged request, Coinbase has systematically refused to produce any IP-authentication data or device-verification records.

**48.** The irreconcilable disparity between Defendant's written explanation and its own documentary evidence (the blank form) demonstrates that the limit increase was an internal administrative override, retroactively and falsely attributed to the household's network signature to shift liability away from Defendant.

**E. Inconsistent Explanations Regarding the Alleged API Key**

**49. On November 14, 2020,** Defendant represented in writing to the property owners that the unauthorized November 11 transfers were executed via a newly created Application Programming Interface **("API") key generated on November 10, 2020**, immediately prior to the theft.

**50.** After Defendant was confronted with the fact that a **newly created API key is** automatically **disabled** from executing **withdrawals for 48 hours** under its own security protocols, Defendant abruptly altered its explanation. **On December 1, 2020**, Defendant stated in writing that the unauthorized transfers were instead executed using an **API key allegedly created** on **July 3, 2018**. However, account data produced by Defendant shows **no operational record of any API key created on that date,** rendering Defendant's shifting explanations pretextual and misleading, and designed to conceal an internal system breach.

**51. The only authentic API key** created by the user was **dated July 1, 2018**, and that key was strictly configured with read-only data access, completely **lacking "trade" or "send transactions" permissions.**

**52.** Although Defendant removed the transaction history from the customer "Activity Page" to

obscure the trail of the theft, the data record reveals that all forty-one (41) unauthorized transactions were executed with an originating **network IP address of "Null" and a session source identifier of "Null**." The presence of these "Null" indicators confirms that no user-configured API key was ever deployed to execute the unauthorized transfers. Defendant systematically refused to produce any verified API transaction logs.

**F. Suppression of Activity Records and Internal Network Origin**

**53. Proof of Internal Execution:** In the days immediately preceding the theft, Defendant's internal database logs reveal that the account backend was accessed from a private network address signature designated **under RFC 1918** standards. This **10.120.x.x** network signature is reserved exclusively to Defendant's internal backend infrastructure, production servers, and corporate intranet environment. This signature is technically, structurally, and geographically irreconcilable with any external consumer session or remote third-party hack conducted over the public internet.

**54. Privileged Backend Session:** The confluence of "Null" transaction sources and an internal **10.120.x.x** access signature establishes that Plaintiff's property was exfiltrated through a privileged backend administrative session that bypassed the standard authentication gates, device-verification checks, and multi-factor authentication protocols required for consumer-initiated transactions. Customer accounts cannot initiate withdrawals through this internal corporate channel, nor can any external actor access it via the public internet. The deployment of this internal-only pathway is inconsistent with any end-user activity, demonstrating that the transfers originated entirely within Defendant's core infrastructure.

**55. Plausibility of Claims:** Plaintiff's allegations are supported by direct documentary evidence and transactional metadata—including records showing the "Null" entries, evidence of the missing record for the date of the unauthorized transfers, a screenshot capturing the internal 10.120.x.x access signature, evidence that Plaintiff had only one API key and that this key lacked the "trade" and "send transactions" permissions, the tampered "Request Form" for increasing the daily

13

withdrawal limit, and written correspondence issued by Defendant. These materials cross the threshold of federal pleading plausibility and will be produced in full during discovery.

**56. Ongoing Deprivation and Equitable Estoppel:** Plaintiff has been wrongfully and continuously deprived of his indivisible ownership interest in the 1,000 ETH since November 11, 2020. Because Defendant maintains exclusive control over the core database logs and has intentionally withheld this documentation for tone consistency to prevent identification of the internal converting actors, Defendant is equitably estopped from asserting any defense based on lack of internal knowledge, third-party liability, or the expiration of statutory time limitations.

**SECTION VII: CAUSES OF ACTION**

**COUNT I — DECLARATORY JUDGMENT**

**(28 U.S.C. §§ 2201–2202)**

**57.** Plaintiff repeats and re-alleges paragraphs 1 through 56 of this Complaint as if fully set forth herein.

**58.** An actual, substantial, and justiciable controversy exists between Plaintiff and Defendant concerning the independent legal and beneficial ownership of approximately 1,000 ETH (the "Property") and the complete inapplicability of any third-party contractual restrictions to Plaintiff's vested proprietary interests.

**59.** Plaintiff maintains an independent ownership interest in the Property as a tenant by the entirety. The capital used to acquire the digital assets originated from a joint marital account governed by laws protecting the entirety property, giving Plaintiff an absolute, non-severable right to the whole of the assets.

**60. Total Lack of Contractual Privity:** Plaintiff is a strict non-signatory to Defendant's platform agreements. Plaintiff never viewed, executed, assented to, or ratified any Coinbase User Agreement, nor did Plaintiff ever delegate, assign, or authorize his spouse or any other agent to

subject his personal property rights to Defendant's contractual waivers, arbitration clauses, or liability limitations. Defendant has no legal or equitable authority to treat Plaintiff's property rights as derivative of a contract he never saw or signed.

61. Plaintiff respectfully requests a judicial declaration and judgment pursuant to **28 U.S.C. § 2201** stating that:

**(a)** Plaintiff is a legal and beneficial owner of an indivisible interest in the whole of the Property;

**(b)** Plaintiff's ownership interest in the Property exists independently of any platform contract executed by his spouse;

**(c)** Plaintiff is a non-signatory who is not bound by the arbitration clauses, venue selections, or liability limitations contained in the Coinbase User Agreement; and

**(d)** Defendant has no legal or equitable authority to withhold the Property, or the forensic database logs pertaining to its internal disposition, from Plaintiff.

62. A declaratory judgment is necessary and appropriate to resolve these threshold legal relations between the parties, confirming Plaintiff's independent standing to pursue a merits-based determination of his common-law claims for Conversion, Breach of Bailment, and Fraudulent Concealment.

**COUNT II — FRAUDULENT CONCEALMENT**

**(Against Defendant Coinbase, Inc.)**

63. Plaintiff repeats and re-alleges paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64. **Defendant's Exclusive Possession of Material Facts:** At all relevant times, Defendant exercised exclusive custody, possession, and technical control over the internal authentication logs, API-creation records, routing metadata, and backend administrative records governing the Property. The material facts necessary to discover the true internal origin, administrative modifications, and execution pathways of the unauthorized transfers were, and remain, exclusively

15

within Defendant's possession and are completely inaccessible to Plaintiff through any independent means.

**65. Intentional Failures to Disclose:** Despite holding exclusive knowledge of its own internal systemic and security failures, Defendant intentionally suppressed and concealed the core forensic evidence of the unauthorized transfers, including:

**(a)** The network routing and IP logs detailing the precise origin and execution path of the unauthorized exfiltration;

**(b)** The internal configuration logs and metadata histories for the specific Application Programming Interface (API) keys Defendant asserted were utilized to effectuate the transfers;

**(c)** The administrative audit logs identifying the specific internal employee credentials, master commands, or automated overrides deployed to manipulate and double the account's daily withdrawal thresholds; and

**(d)** The backend access records that would reveal whether an internal corporate infrastructure breach, insider compromise, or privileged administrative account session was utilized to manipulate the ledger.

**66. Affirmative Misrepresentations and Misleading Disclosures:** Rather than revealing the true backend origin of the breach, Defendant provided materially inconsistent, pretextual, and false explanations to the property owners. This included producing entirely blank forms stripped of data to justify a high-risk manual withdrawal limit increase, and providing shifting, self-contradicting dates regarding the utilization of unauthorized API keys. Defendant engaged in these deceptive partial disclosures while refusing to produce the underlying audit-trail logs that would expose those representations as false.

**67. Special Duty to Disclose:** Defendant owed a strict legal and equitable duty to disclose these material facts because it possessed superior and exclusive knowledge of its internal backend data, which Plaintiff could not access through any amount of reasonable diligence. Defendant

16

compounded this imbalance by making misleading partial disclosures that were deceptive absent the full context of the underlying system logs. As a New York-licensed virtual-currency business regulated under **23 NYCRR Part 200**, Defendant was legally obligated to preserve transaction metadata and safeguard custodial assets against unauthorized conversion.

**68. Intentional Concealment and Scienter:** Defendant intentionally withheld its complete internal audit data and provided shifting, pretextual explanations with full knowledge of their falsity. This concealment was executed to avoid liability, prevent discovery of the internal backend exploit, and obscure Defendant's systemic custodial-control deficiencies.

**69. Continuous Course of Conduct:** Defendant's fraudulent concealment of technical audit trails and its active misrepresentations regarding the source of the transfers constitute a continuous course of deceptive conduct calculated to prevent Plaintiff from discovering the operational indicators necessary to timely assert his rights.

**70. Equitable Estoppel and Tolling:** By reason of Defendant's continuous fraudulent concealment, affirmative obstructions, and spoliation of customer-facing portfolio records, Defendant is equitably estopped from asserting any defense predicated on the expiration of the statute of limitations. The limitations period governing Plaintiff's claims is equitably tolled under both New York law and federal common-law principles.

**COUNT III — CONVERSION**

**(Against Defendant Coinbase, Inc.)**

**71.** Plaintiff repeats and re-alleges paragraphs 1 through 70 of this Complaint as if fully set forth herein.

**72. Superior Possessory Right:** Plaintiff held a direct, vested ownership interest and a superior possessory right in approximately 1,000 ETH (the "Property"). These digital assets were entrusted to Defendant within its regulated custodial infrastructure under a bailment relationship for the sole purpose of safekeeping.

17

**73. Exclusive Custodial Control:** At all relevant times, Defendant exercised complete physical and technical dominion over the private keys and database ledgers controlling the Property. Defendant's initial possession of **the assets** was lawful in its capacity as a professional custodian, but remained strictly subject to Plaintiff's superior, non-severable ownership rights.

**74. The Act of Conversion:** On November 11, 2020, Defendant committed conversion by exercising unauthorized dominion and control over the Property. Defendant overrode its own internal safety protocols, manipulated its backend database ledger, and executed the unauthorized exfiltration of the 1,000 ETH through its internal network systems without any valid consumer credentials or user authorization.

**75. Demand and Refusal:** Following the unauthorized transfers, formal demands for an accounting and return of the Property were submitted to Defendant on **January 2 and January 27, 2021. In February 2021,** Defendant closed these requests without returning the assets or providing an accounting. Under New York law, a conversion claim against a lawful custodian accrues only upon a formal demand and refusal.

**76. Incorporation of Equitable Estoppel:** To the extent Defendant asserts that the limitations period expired after the February 2021 refusal, Defendant is equitably estopped from raising a statute-of-limitations defense. As detailed in Count II, Defendant's affirmative, continuous acts of fraudulent concealment—including deleting user activity screens, fabricating shifting API creation timelines, and hiding its internal network footprint **(10.120.x.x)**—deliberately misled Plaintiff and actively prevented a merits-based judicial determination of the internal infrastructure compromise.

**77. Permanent Derogation of Rights:** Defendant's execution of the unauthorized transfers from its internal network, combined with its subsequent bad-faith refusal to restore the assets to the ledger, constitutes an absolute, permanent deprivation of Plaintiff's superior property rights.

**78. Demand for Damages:** As a direct and proximate result of Defendant's conversion, Plaintiff has been completely deprived of his independent property interest in the 1,000 ETH. Plaintiff is

entitled to compensatory damages in an amount to be determined at trial, representing the value of the assets at the time of conversion or the highest intermediate market value within a reasonable timeframe thereafter, plus pre-judgment interest at New York's statutory rate of 9% per annum pursuant to **N.Y. C.P.L.R. §§ 5001 and 5004**.

**COUNT IV — BREACH OF BAILMENT**

**(Against Defendant Coinbase, Inc.)**

**79.** Plaintiff repeats and re-alleges paragraphs 1 through 78 of this Complaint as if fully set forth herein.

**80. Entrustment of Property:** At all relevant times, Plaintiff held a direct, vested ownership interest and a superior possessory right in approximately 1,000 ETH (the "Property"). These digital assets were entrusted to, accepted by, and stored within Defendant's proprietary custodial platform for the exclusive purpose of safekeeping.

**81. Bailment Implied in Law:** By accepting, storing, and exercising exclusive physical, cryptographic, and digital control over assets in which Plaintiff held a vested property interest, Defendant entered into a constructive bailment relationship with Plaintiff by operation of law. This bailment arose entirely from Defendant's voluntary assumption of absolute custody over Plaintiff's property and exists independently of any written platform agreement or consumer adhesion contract to which Plaintiff was a strict non-signatory.

**82. Professional Bailee's Duty of Care:** As a professional bailee-for-hire and regulated custodial entity licensed under New York law, Defendant owed an absolute, non-delegable duty to exercise reasonable and ordinary care to safeguard Plaintiff's Property, maintain an uncorrupted administrative ledger, and protect the assets from unauthorized internal exfiltration or administrative system overrides.

**83. Material Breach of Custodial Obligations:** Defendant breached its bailment duties and failed to exercise ordinary care by:

19

**(a)** Permitting the unauthorized, unauthenticated modification of the account's daily withdrawal thresholds immediately preceding the unauthorized transfers;

**(b)** Overriding its own automated security systems by executing and allowing **twenty-seven (27) separate outbound transfers to clear,** despite concurrently generating system notifications stating that those transfers had failed for exceeding the account's daily withdrawal limits;

**(c)** Suppressing mandatory automated security alerts and failing to deploy standard multi-factor authentication checks; and

**(d)** Allowing the assets to be permanently removed via Defendant's own internal backend network infrastructure, as demonstrated by the private **10.120.x.x** network signatures and transaction metadata reflecting "Null" routing origins.

**84. Demand and Refusal:** Following the unauthorized transfers, formal demands for an accounting and return of the Property were submitted to Defendant on January 2 and January 27, 2021. In February 2021, Defendant closed these requests without returning the assets, restoring the ledger balance, or providing restitution. Under New York law, a breach of bailment claim against a lawful custodian accrues only upon a formal demand and refusal.

**85. Shifting Burden of Proof:** Under New York law, a professional bailee's failure to return entrusted property upon a valid demand creates a *prima facie* presumption of negligence and breach of bailment. The burden of proof shifts entirely to Defendant to legally justify the loss of the Property and demonstrate that it exercised due care.

**86. Judgment and Damages:** As a direct and proximate result of Defendant's breach of its bailment obligations, Plaintiff has suffered severe economic damages and total deprivation of his Property. Plaintiff is entitled to compensatory damages in an amount to be determined at trial, representing the full value of the converted assets, plus pre-judgment interest at New York's statutory rate of 9% per annum pursuant to **N.Y. C.P.L.R. §§ 5001 and 5004**.

**COUNT V — UNJUST ENRICHMENT**

**(Pled in the Alternative — Against Defendant Coinbase, Inc.)**

**87.** Plaintiff repeats and re-alleges paragraphs 1 through 86 of this Complaint as if fully set forth herein.

**88. Pleading in the Alternative:** Plaintiff is a strict non-signatory and not a party to any enforceable platform user agreement governing his independent property interest in the approximately 1,000 ETH (the "Property"). To the extent that the Court finds no valid contract directly governing the dispute between Plaintiff and Defendant, Plaintiff pleads this claim for Unjust Enrichment in the alternative.

**89. Quasi-Contractual Relationship:** Defendant is a state-regulated professional asset custodian and BitLicense holder. By voluntarily accepting, holding, and maintaining exclusive digital and cryptographic custody over the 1,000 ETH in which Plaintiff held a vested property interest, Defendant established a direct, quasi-contractual relationship of trust, stewardship, and safekeeping with Plaintiff under common law.

**90. Receipt of Direct Financial Benefit:** Defendant received and continuously retained substantial financial benefit stemming directly from the wrongful retention and unjust exfiltration of the 1,000 ETH.

**91. At Plaintiff's Sole Expense:** This substantial enrichment was obtained entirely at Plaintiff's sole expense. Plaintiff has been completely and wrongfully deprived of his independent, vested ownership interest in his digital assets, as well as all appreciation and market gains generated by those assets since November 11, 2020.

**92. Against Equity and Good Conscience:** Coinbase controls all of the internal data, refuses to return Plaintiff's stolen funds, and withholds the internal logs that would show what actually happened. Under these circumstances, it would be unfair and unjust to allow Coinbase to keep the money.

**93. Necessity of a Constructive Trust:** The 1,000 ETH and its traceable proceeds constitute

specific, uniquely identifiable, and distinct digital property. Because Defendant obtained and has equitably retained dominion over these specific assets through inequitable, unauthorized, and wrongful backend means, any remedy at law may be inadequate.

**94. Imposition of Constructive Trust:** Equity and good conscience require this Court to impose a Constructive Trust over the 1,000 ETH, its equivalent current value, or any alternative assets or digital protocols into which the Property has been converted, as well as all traceable corporate proceeds, increments, yields, or fees generated by Defendant's wrongful retention of the Property, making Defendant an equitable trustee bound to deliver full restitution to Plaintiff.

**95. Timeliness of Equitable Relief:** This cause of action seeking equitable restitution and the formal imposition of a constructive trust is timely under New York's six-year statute of limitations for equitable claims pursuant to **N.Y. C.P.L.R. § 213(1)**, having been commenced within six years of the November 11, 2020 unauthorized backend transfers. Furthermore, as detailed in Count II, because Defendant actively concealed the internal infrastructure pathways of the loss, Defendant is equitably estopped from asserting any statutory time bars.

**96. Restitution and Disgorgement Sought:** Plaintiff seeks full restitution in the amount of the highest intermediate market value of the 1,000 ETH, or the total value of the financial benefits unjustly retained by Defendant, whichever is greater, together with an equitable accounting, complete disgorgement of all ill-gotten gains, and the formal imposition of a constructive trust.

## VIII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Vijay Tandon respectfully requests that this Court enter judgment in his favor and against Defendant Coinbase, Inc., and award the following relief:

**A. Compensatory Damages:** An award of compensatory damages in an amount to be determined at trial, representing the total loss of approximately 1,000 ETH, calculated at the highest

22

intermediate market value of the assets between date of the conversion and a reasonable time after Plaintiff discovered the true internal nature of the loss.

**B. Equitable Relief:** An order compelling a full equitable accounting and the complete disgorgement of all ill-gotten gains, together with the formal imposition of a Constructive Trust over the approximately 1,000 ETH at issue, its equivalent current value.

**C. Declaratory Relief:** A judgment pursuant to **28 U.S.C. § 2201** declaring that Plaintiff holds an independent, indivisible ownership interest in the Property as a tenant by the entirety, that Plaintiff was a strict non-signatory to Defendant's platform agreements, that he is unbound by any arbitration provisions, venue selections, or contractual liability limitations contained therein, and retains full independent standing to pursue common-law judicial remedies in this Court.

**D. Interest:** An award of pre-judgment interest at New York's statutory rate of 9% per annum pursuant to **N.Y. C.P.L.R. §§ 5001 and 5004**, computed from November 11, 2020, through the date of entry of final judgment, and post-judgment interest at the applicable federal rate pursuant to **28 U.S.C. § 1961** from the date of entry of judgment until paid in full.

**E. Other Relief:** Such other, further, or alternative relief as this Court may deem just, proper, and equitable under the circumstances.

**Respectfully submitted,**

**Dated: May 21, 2026**

/s/ Vijay Tandon, Plaintiff, Pro Se
460 Archway Dr.,
Spring Hill, FL 34608
Email: vijay.tandon1604@gmail.com
Phone: 678.613.2795

**Verification**

I, Vijay Tandon, declare under penalty of perjury that the foregoing Complaint is true and correct to the best of my knowledge, information, and belief.

23

**Executed on: May 21, 2026**

**/s/ Vijay Tandon**

24